In this case a custodial receiver was appointed for the Dealers Credit Association, incorporated under the laws of the State of Delaware. On the return day objection was made to the continuance of the receiver on the ground that this court has no jurisdiction to appoint a receiver of a foreign corporation which is not insolvent, as it would be interfering with its internal affairs.
The company, though incorporated in Delaware, never did business in that state. Its business is being conducted in *Page 311 
this state. The complainants Hill and Bunn are admittedly officers and directors. Two of the defendants, Daniels and Jones, are admittedly directors; defendant Thomassen claims to be a director. These are all the directors and officers of the corporation, and they are all before the court. All the property of the corporation was in this state when the custodial receiver was appointed, except two bank accounts, which the receiver has since reduced to possession. Therefore, the corporation, all its officers and directors, and all its assets are within the control of this court.
Two questions are presented in this connection — first, the inherent jurisdiction of this court in a situation as above outlined, and second, the jurisdiction conferred on the court of chancery by our Corporation act. The case of Burnrite CoalBriquette Co. v. Riggs, 71 L.Ed. 1002 (May 2d 1927), has an important bearing on this question.
A bill was filed in the United States district court for the district of New Jersey for the appointment of a receiver of a foreign corporation upon the ground of mismanagement, and that the business was being conducted at great loss. The district court appointed receivers. The circuit court of appeals reversed the district court (291 Fed. Rep. 754) for the reason that under the statute of New Jersey as construed by its courts the court had no jurisdiction to appoint a receiver of a solvent foreign corporation upon the ground that its business is being conducted at great loss and greatly prejudicial to its creditors and stockholders. It directed the district court to dismiss the bill for lack of jurisdiction. Instead of doing this the district court required the receivers to account, fixed their fees — about $90,000 — and directed that when such payments were made the bill would be dismissed. This decree was taken to the circuit court of appeals and thence to the United States supreme court oncertiorari. The first decree of the circuit court of appeals was not before the supreme court for direct action, yet it was urged on the argument that the circuit court of appeals in its first opinion erred in finding that the district court had no jurisdiction. The United States supreme court, in a unanimous opinion by Mr. Justice Brandeis, held — *Page 312 
"The bill charged gross mismanagement; prayed for the appointment of a receiver to conserve the assets, and asked that, `if deemed advisable,' the court `proceed under the statutes of the State of New Jersey' * * * and that the receiver be given all the powers and be charged with all the duties imposed upon such a receiver by the statutes." * * *
"The court of appeals held that there was lack of jurisdiction of the subject-matter. It assumed that the jurisdiction of the federal court was dependent upon the state statute. This waserror. A federal district court may, under its general equitypowers independently of any state statute, entertain a bill of a stockholder against the corporation for the appointment of at least a temporary receiver in order to prevent threateneddiversion or loss of assets through gross fraud and mismanagement."
"The fact that a bill seeking appointment of a receiver of a corporation is brought in a state other than of the corporation may lead the court to decline to interfere as a matter of comity or for want of equity; or it may require the court to limit the scope of the relief granted." * * *
"But the fact of incorporation under the laws of another state does not preclude jurisdiction." * * *
"If the dismissal directed by the court of appeals in the first appeal was proper [as to which we have no occasion to express an opinion], it must be justified on the ground that, in view of the facts, the district court erred in the judgment in appointing and continuing the receivers. * * * In other words, the dismissal must rest on the ground that there was want of equity, not on lack of jurisdiction."
"We have no occasion to determine whether a federal district court which appoints a receiver in a case in which it necessarily lacks jurisdiction of the subject-matter, so that jurisdiction cannot be acquired by acquiescence, may, nevertheless, impose upon the corporation, because of acquiescence, the usual charges incident to a receivership. For in the case at bar the districtcourt had throughout jurisdiction of the subject-matter."
In Babcock v. Farrell, 245 Ill. 14; 19 Ann. Cas. 74, the court said: *Page 313 
"Except in cases involving the exercise of visitorial powers, the question is not strictly one of jurisdiction, but rather of discretion in the exercise of jurisdiction. The reasons which influence courts of chancery to refuse to interfere in the management of the internal affairs of a forign corporation are, that the rights arising between a corporation and its members out of such management depend upon the laws of the state under which the corporation is organized; that the courts of that state afford the most appropriate forum for adjudication upon the relation between the stockholders and the corporation, and that frequently such courts alone possess power adequate to the enforcement of all decrees that justice may require. It is theinability of the court to do complete justice by its decree, andnot its incompetency to decide the question involved, that determines the exercise of its power. The general statement that the courts will not interfere with the management of the internal affairs of foreign corporations must be construed in connection with the particular facts. The rule rests more on grounds of policy and expediency than on jurisdictional grounds; more on want of power to enforce a decree than on jurisdiction to make it."
In Chicago Title and Trust Co. v. Newman,187 Fed. Rep. 573, the circuit court of appeals for the seventh circuit said, speaking through Judge Sanborne:
"Strictly speaking, there never was any question of jurisdiction in the case. It was one of equity power. A court of equity will not, as a general rule, administer the internal affairs of a foreign corporation. As decided by the supreme court of Illinois in Babcock v. Farrell, 245 Ill. 33;91 N.E. Rep. 583, the question is not strictly one of jurisdiction, but rather of discretion, in the exercise of jurisdiction. And the supreme court of the United States has often had occasion to make the same distinction. Blythe v. Hinckley, 173 U.S. 501;43 L.Ed. 783; Bache v. Hunt, 193 U.S. 523; 49 L.Ed. 774;Louisville Trust Co. v. Knott, 191 U.S. 225; 48 L.Ed. 159;
see, also, In re Hill Co., 159 Fed. Rep. 73."
In Starr v. Bankers' Union, c., 81 Neb. 377; 116 N.W. 61,
the court said:
"That a court should not appoint a receiver to administer *Page 314 
the internal affairs of a foreign corporation is a very general rule, the reason for which is that the court cannot obtaincontrol of all the property, books, records and members of thecorporation so as to do full justice between all the partiesinterested, but the operation of this rule ceases when the reason for it no longer exists, and whatever might be the objection to appointing a receiver for the property for a foreign corporation found in this state where such property is only part of its assets, and where the books and records and officers of such corporation are beyond the process of the court, they do not apply in this case. * * * None of the ordinary reasons why the courts of this state should not take jurisdiction of these assets remained, but whether the suit in which the receiver was appointed is considered as one to subject the assets of the foreign corporation found in this state to the payment of its debts, or whether it be considered as a suit to administer and wind up the affairs of such corporation, every reason exists why the courts of this state should take jurisdiction."
The inherent jurisdiction of the court of chancery is as broad as that of a United States court sitting in equity, because each derives that jurisdiction from the same source — the jurisdiction of the High Court of Chancery of England. The theory of the cases I have quoted, and of others I have examined, but deem it unnecessary to refer to in detail, is that in a case similar to the one now under discussion the question is not one of jurisdiction; it is rather whether the court can, should it assume jurisdiction, make its decree effective. In other words, not whether it has jurisdiction, but should it in its discretion exercise the inherent jurisdiction which it possesses. Here we have a foreign corporation whose business and assets are in New Jersey and all of the directors of which are before the court. It seems to me that this court has jurisdiction under its inherent equity power to consider the appointment and continuance of a receiver.
Having so found, I deem it unnecessary to prolong this opinion by a discussion of whether such a motion could be entertained under the terms of our Corporation act. *Page 315 
We, therefore, come to a consideration of the facts as presented. The Dealers Credit Corporation was incorporated under the laws of Delaware. There were four hundred shares of common stock, no par value with voting power, and six hundred shares of preferred stock, par $100, without voting power. Jones and Daniels incorporated the company. In September, 1925, Hill, complainant, came into the organization and was made treasurer. These three made an agreement on September 4th, the main features of which are as follows:
"Whereas, it is the purpose of the parties hereto that all thecommon stock of Ford Dealers Mutual Corporation shall be held andcontrolled by trustees and by them administered and the income and dividends arising therefrom used, applied and distributed to the persons, in the proportion and in the manner hereinafter set forth, * * *.
"Whereas, all of the common stock has been issued in the name of, and is held by, Herbert L. Hill, C.C. Daniels and E. Milton Jones, represented and evidenced by eight [8] certificates of stock for fifty [50] shares each, * * *.
"Whereas, a portion of said common stock has been this day placed in `Founders Syndicate Trust,' for the purpose of effectuating and carrying out the terms and conditions of Founders Syndicate of Ford Dealers Mutual Corporation, as set forth and stipulated in the said `Founders Syndicate Trust' * * *.
 "MUTUALLY AGREED
"First. Each of the parties hereto will act and be a trusteeunder the powers, terms and conditions hereof and hold theentire common stock of Ford Dealers Mutual Corporation for the purpose and uses, subject to and in accordance with the powers, terms and conditions herein set forth until his successor is selected and qualified.
"Second. The trustees herein named, and their successors, will collect the dividends from the common stock of Ford Dealers Mutual Corporation, subject to the trust imposed on the said common stock by `Founders Syndicate Trust' [a copy of which is hereto attached marked Exhibit `A' and made a part hereof], and pay the same when and as received to Ford Dealers Mutual Corporation to be by it used exclusively to defray the costs and expenses of making sale of the one million [$1,000,000] dollars of preferred stock authorized by its charter * * *.
"Seventh. The common stock of Ford Dealers Mutual Corporation will not be increased and the common stock put in trust by this instrument will not be voted to authorize an increase of the common stock except by agreement expressed in writing of all theparties hereto or their legal representatives. *Page 316 
"Eighth. This agreement and declaration of trust is not negotiable, transferable or assignable. In so far as the same affects the `Founders Syndicate Trust' the same is irrevocable
without the written consent of at least two-thirds in amount of the holders of membership in Founders Syndicate of Ford Dealers Mutual Corporation." * * *
On the 4th day of September a trust declaration was signed by Daniels, Hill and Jones, which, after reciting that they were syndicate managers of Founders Syndicate of Ford Dealers Mutual Corporation, and
"have entered into agreement with the various subscribers to said syndicate that a certain portion of the common stock of FordDealers Mutual Corporation would be held in trust and the dividends therefrom applied in accordance with the terms and conditions in said founders syndicate agreement set forth. * * *
 "MUTUALLY AGREED
"That one-half of the common stock of Ford Dealers Mutual Corporation, or such portion thereof as the total paid subscriptions to said syndicate bears to the amount to which the syndicate is limited, is, and will be, held in trust for the benefit of subscribers to Founders Syndicate of Ford Dealers Mutual Corporation until each subscriber has been paid four [$4] dollars for each dollar by him subscribed, and paid, in accordance with its terms, a copy of which is hereto attached marked Exhibit A and made a part hereof."
In 1926 Bunn became president of the corporation. An agreement was entered into by Daniels, Hill, Jones and Bunn, May 11th, 1926. Under its terms Bunn was to be paid a salary of $12,000 a year, commencing June 1st, 1926 — $1,000 to be paid June 1st and to be invested in syndicate membership; $600 was to be paid him each month and the balance on June 30th, 1927. The agreement contains this clause:
"Common Stock. One hundred shares [100] of common stock now held in the joint names of H.L. Hill, C.C. Daniels and E. Milton Jones are to be transferred to and held by Paul V. Bunn just asthe stock of Hill, Daniels and Jones is now held, it being mutually agreed however that in case Paul V. Bunn voluntarily withdraws from the corporation's services before June 30th, 1927, he will upon receipt of the pro rata year's salary, assign andreturn the aforesaid one hundred shares of stock to the other trustees. It is further agreed that upon the completion of the first twelve [12] months' service, as June 30th, 1927, seventy-five [75] shares of the said one hundred shares ofcommon stock shall thereupon become the absolute property of *Page 317 Paul V. Bunn or his estate and the remaining twenty-five [25] shares together with twenty-five [25] shares each of the common stock held by C.C. Daniels, Herbert L. Hill and E. Milton Jones shall be held in trust to be disposed of as the trustees may agree, provided that he shall at that time offer to contract for a continuation of his services to the corporation, at a salary no less than $12,000 for an additional period of two years, to wit, until June 30th, 1929, or such part of that period as the other trustees may desire to designate."
On the 19th day of November, 1926, another agreement was signed between Bunn, Hill, Daniels and Jones, which is entitled "Agreement supplementary to common stock trust of September 4th, 1925," which recites an agreement between Bunn, Hill, Daniels and Jones, dated May 11th, 1926:
"Whereas, it is desired by the parties hereto to carry out and perfect the terms thereof except as specifically herein modified:"
and then agrees:
"2. That the one hundred [100] shares of common stock of Ford Dealers Mutual Corporation now issued and outstanding in the joint names of Herbert L. Hill, C.C. Daniels and E. Milton Jones, represented by certificates numbered 7 and 8 [in the possession of Herbert L. Hill as custodian] be and the same are herebytransferred to, and shall be held by Paul V. Bunn just as thecommon stock of Ford Dealers Mutual Corporation issued and heldin the several names of Herbert L. Hill, C.C. Daniels and E.Milton Jones is now held.
"3. That Paul V. Bunn be and he is hereby made a trustee inthe common stock trust dated September 4th, 1925, by this separate agreement and the number of trustees in said common stock trust is hereby increased from three [3] to four [4] and the said Paul V. Bunn is hereby made the fourth trustee.
"4. That the income, dividends and proceeds arising out of the common stock or in accordance with the terms of the common stock trust are hereby designated and directed to be paid to the following persons or their legal representatives, to wit:
"5. From seventy-five shares of the common stock outstanding and held in the names of Herbert L. Hill to Harriet Hill.
"6. From seventy-five shares of the common stock outstanding and held in the name of C.C. Daniels to Mary Swain Daniels, Evelyn Hope Daniels and James Robinson Daniels."
And then there are several other provisions with respect to where the dividends should go.
"10. In the event that the said Paul V. Bunn shall, in accordance with the terms of his said contract of May 11th, 1926, retire from active participation in the management of the Ford Dealers Mutual Corporation *Page 318 
and return the one hundred [100] shares of common stock herein transferred to him on the terms herein set forth, then and in that event, the trustees shall thereafter be three, and Herbert L. Hill, C.C. Daniels and E. Milton Jones shall have full authority to act as if said Paul V. Bunn had not heretofore become a trustee."
On May 2d 1927, another agreement was signed by the above-mentioned four. This modified the trust agreements in relation to the common stock by permitting the withdrawal from the trusts of a portion of the common stock, and provided that seventy-five shares of common stock "held in the joint names of the undersigned shall be used for the purpose of securing additional capital by the sale of units." The agreement further provides "all of the common stock remaining in the trusts shall be voted as determined by unanimous agreement expressed in writing of the undersigned or their successors under the trusts." The defendants say this agreement was never carried into effect. Matters went smoothly for a time and then it became apparent that the company could not afford to pay Bunn's salary. In June, 1927, it owed him about $6,000. He sent the board of directors a letter stating:
"My contract with this corporation dated May 11th, 1926, provides that at the end of my first year of service as president of the company, seventy-five of the one hundred shares of common stock carried in my name shall become the absolute property ofmyself or my estate, provided that I `offer to contract for a continuation,' of my services to the corporation for an additional period of two years, or such part of that period as the other three trustees may desire to designate.
"Under the terms of that contract, therefore, I hereby make formal offer to the board of directors, severally and collectively to continue my services to the company, as the board may decide."
Bunn continued to act as president and Hill to act as treasurer. The corporation's indebtedness to Bunn was canceled by the payment of $2,000. On December 6th, 1927, a meeting of the directors and stockholders was held in Newark. It was called by Jones, the secretary, on his own initiative. At the stockholders' meeting it was announced that Bunn would not be recognized as a stockholder, and that Daniels, Hill and Jones could each vote one hundred and thirty-three *Page 319 
and one-half shares of stock. Bunn and Hill withdrew. Jones and Daniels continued the meeting. They increased the directors from four to five; elected Thomassen as a fifth director; gave the secretary the same authority as the president and made a contract with another corporation — in which Jones was interested — to manage the business for fifty per cent. of the profits. Jones and Daniels were named as an executive committee and empowered to exercise the duties of directors when the directors were not in session. The new directors then held a meeting. They made Thomassen assistant treasurer and vice-president; made a man named Falk manager, and provided that all checks should be signed either by Thomassen or Falk and countersigned by the president or treasurer or secretary. The banks were so notified. By this ingenious method the president, Bunn, and the treasurer, Hill, were practically eliminated from the conduct of the company's affairs, which were turned over to the Credit Management Corporation in which Jones, the secretary, was interested. The president, Bunn, and the treasurer, Hill, refused to recognize these acts, and the banks were notified not to recognize the new officers or honor checks. Hence, the business came to a standstill, and thereafter the custodial receiver was appointed. It seems to me that this case resembles very closely that of Inre New Jersey Refrigerating Co., 95 N.J. Eq. 215. In that case Mr. Justice Parker, speaking for the court of errors and appeals, said (syllabus 2): "The court of chancery under its general equity powers may appoint a receiver of a corporation, even though solvent, in cases where there is a present danger to the interests of the stockholders consisting of a serious suspension of or interference with the conduct of the business and a threatened or actual depreciation of the value of the assets consequent thereto." The learned justice, after reciting facts in that case very similar to those disclosed in the case at bar, says (at p. 222): "affairs had reached an impasse. * * * A plainer case for the interposition of the court of chancery could not well be imagined." The opinion cites numerous New Jersey cases. I shall therefore make the appointment of the receiver permanent according to the prayer of the bill. *Page 320