24 N.J. Super. 385 (1953)
94 A.2d 540
HUNGERFORD & TERRY, INC., ET ALS., PLAINTIFFS,
v.
HARRIS D. GESCHWINDT, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 20, 1953.
*387 Mr. Horace G. Brown, attorney for plaintiffs (Mr. Howard G. Kulp, Jr., of counsel).
Mr. Wilfred B. Wolcott, attorney for defendants Harris D. Geschwindt, et als.
Mr. Thomas M. Farr, attorney for defendants Grace Elizabeth Hungerford Hillman, et als. (Messrs. Norcross & Farr, attorneys).
Mr. Frederick P. Greiner, guardian ad litem for minor defendants (Messrs. Boyle, Archer & Greiner, attorneys).
HANEMAN, J.S.C.
The complaint seeks a construction of the amendment to the certificate of incorporation of Hungerford & Terry, a corporation of the State of Delaware. The trustee plaintiffs as well seek instruction as to the action they should take in connection with a proposed or suggested additional amendment to said certificate of incorporation. The relief sought is brought under both the general equity powers of this court and under the Declaratory Judgment Act, R.S. 2:26-66 et seq.
The plaintiffs include said corporation and Churchill Hungerford, Jr., and First Camden National Bank & Trust Company, the latter two being trustees under deeds of trust of Churchill Hungerford, Sr., and Elizabeth M. Hungerford, and the will of the former. The trustees hold shares of Classes A and B stock, hereinafter more particularly referred to, in said trusts. Churchill Hungerford, Jr., in addition *388 to being a trustee of the three trusts, is also a beneficiary thereof, and he is also the owner of Class B stock.
Simply stated, the plaintiffs allege that there is an ambiguity in the instrument, since the apparent provisions of paragraph (b) are inconsistent with the actual intent as exhibited by the balance of the lettered paragraphs, i.e., that although paragraph (b) would seem to give the holders of Class A stock a preferential right to be paid $375 per share upon liquidation, out of all of the assets of the corporation, the balance of the paragraphs express the true intent, namely, that the Class A stockholders are limited in their preference to a participation in the assets acquired prior to June 1, 1928.
By way of defense, in addition to urging a particular construction, the defendants, inter alia, raise the following, which will solely be considered in the light of the conclusions hereinafter set forth.
1. The questions here raised are moot, since they involve a speculative state of facts, and there is no justiciable controversy.
2. This court has no jurisdiction, since the question involves the internal affairs of a foreign corporation.
The facts in connection herewith are as follows:
Hungerford & Terry, Inc. was incorporated under the laws of the State of Delaware on May 7, 1909. On July 18, 1928, and prior thereto, Churchill Hungerford, Sr. and his wife Elizabeth M. Hungerford were the actual owners of the entire authorized capital stock, of the par value of $100 per share, although some qualifying shares were not registered in their names, the former owning 185 shares and the latter owning 815 shares. The $100,000 of capital had been fully paid by them. For the years from 1909 to 1928 the said Hungerford, Sr. had been the prime mover in said corporation, and to all intents and purposes was the corporation. As a matter of fact, he was, in the language of the testimony, the "boss" until his death. That the business had been successfully conducted during the years prior to 1928 is *389 evidenced by the book value of the stock just prior to the litigated amendment, which was then computed at $375 per share on the following valuations:

Par value of the existing stock ......................... $100.00
Surplus on the books as of 5/31/28 per share of ......... 227.07
The stock and bonds owned by the corporation
had a market value 5/31/28 in excess of book
value per share of ...................................... 33.15
It was expected that profits on orders received
prior to 5/31/28 but processed after that date
would be per share ...................................... 14.78
 ________
 Totaling $375.00

Moved by a desire to furnish an incentive to certain then present and future key employees to produce for and remain with the corporation, the stockholders (Hungerford, Sr. and his wife) by unanimous vote adopted the amendment hereafter set forth as a profit-sharing plan on July 18, 1928.
The section of the amended certificate of incorporation which gives rise to this action reads as follows:
"Upon dissolution or liquidation of the company, its assets shall be distributed as follows:
(a) If the assets of the Company, other than such surplus (as `surplus' is herein defined) as is accumulated from profits made on contracts entered into and business originating on and after June 1st, 1928, equals or exceeds Three Hundred Seventy-five Dollars ($375.00) per share, said Class A stock shall be entitled to receive all of such assets to the exclusion of Class B stock and the surplus accumulated from contracts entered into and business originating after June 1st, 1928, shall be divided equally between Class A and Class B stock on a per share basis.
(b) If such assets, other than surplus, shall not equal Three Hundred Seventy-five Dollars ($375.00) per share of Class A stock, there shall be paid out of the general assets of the Company, including such surplus, first the sum of Three Hundred Seventy-five Dollars ($375.00) per share for each share of Class A stock, and the balance of assets shall be divided equally between Class A and Class B stock, on a per share basis.
(c) Class A stock shall be entitled to dividends at such rate as may be declared, when and as declared. Subject to the foregoing, Class B stock shall, on and after June 1st, 1929, be entitled to dividends out of profits made by the Company as the result of contracts entered into and business originating after June 1st, 1928, when and *390 as such dividends may be declared on Class B stock by the Company, provided that no dividend may be declared and paid on Class B stock except from surplus, and unless a dividend of like rate per share shall be declared and paid at the same time on Class A stock out of such surplus, and provided that the dividends may be declared on Class A stock during said year.
(d) The assets and profit accumulations acquired by reason of the contracts entered into and business originating on and after June 1st, 1928, subject to such losses as may be sustained, shall be the only property and fund in which Class B shall have an interest or a right and in which it shall be entitled to participate.
(e) Such assets and profit shall be subject to the expense of operation of the entire business from and after June 1st, 1928, and after deduction of such expenses, said assets and profits remaining shall be considered net profits, and wherever in this certificate the word `surplus' is used, it shall be construed as referring to and meaning such net profit; provided,
(f) however, that if after one year from June 1, 1928, any funds of the Company be used in the purchase or sale of securities in which funds or property to which Class A stock is exclusively entitled and funds or assets or profits in which Class B stock is entitled to participate, shall be used jointly in combination, any profit on such securities, including dividends, shall be divided between, and losses thereon shall be shared between the said two classes of funds in the respective proportions of their contribution to the investment fund.
(g) None of the shares of Class B stock of this corporation may be pledged, hypothecated, sold, assigned or transferred by any stockholder or any representative of any deceased or living stockholder, until the holder of such representative shall have first offered the same to the Corporation. The holder or representative shall obtain a satisfactory bona fide offer for said stock, and shall thereupon, through the Corporation and at the expense of such holder, in writing, offer the stock for sale to the remaining holders of Class B stock of the Corporation at a price not higher than such bona fide offer, giving such remaining holders of Class B stock an option to purchase such stock at such price, in proportion to their then holdings, within three months from the date of said offer. Should any of such Class B stockholders refuse or neglect to purchase their portion of said stock, the remaining holders of Class B stock shall have the right to purchase the same in the same proportions. If the holders of Class B stock shall neglect, within three months, to purchase any or all of said stock, the holder or representative shall offer the unsold proportion upon the same terms and conditions to the holders of Class A stock, who shall have the right to purchase the same upon the same terms and conditions as is herein set forth for holders of Class B stock. If, at the end of three months after such offer to the holders of Class A stock any of said Class B stock shall remain unsold, such unsold proportion may then be offered for pledge, hypothecation, sale, assignment or transfer to non-stockholders of the corporation.
*391 (h) No certificate of stock shall be pledged, hypothecated, sold, assigned or transferred where the assignor of said certificate of stock shall be indebted to the Corporation, unless a majority of the Board of Directors authorize such transfer."
Although the above provisions are contained in one paragraph, and the separate sentences are unlettered, for convenience of treatment they have been set forth as above and will be treated according to the alphabetical designation. The word "surplus," as used, must be considered as that defined in paragraph (e).
After the adoption of the amendment, the original stock outstanding was surrendered and in its place and stead the holders received all of the A stock, i.e., 1,000 shares of the par value of $100 per share. The B stock was issued to Hungerford, Sr. and some key employees, including Hungerford, Jr., who is still the owner thereof. All of the B stockholders except Hungerford, Sr. executed contracts with the corporation contemporaneously with the issuance of said stock. These contracts, in addition to repeating the terms of the above amendment, provided, as far as here pertinent, that (1) each holder of Class B stock was obliged to first offer the same to the remaining stockholders for purchase at a price offered therefor by a stranger before accepting a bona fide offer for purchase made by such stranger, and (2) in the event of death, his estate was obliged to sell said stock to the other stockholders at the then book value thereof.
Thereafter, as a result of two inter vivos deeds of trust, i.e., of Hungerford, Sr. and of his wife, and the will of Hungerford, Sr., the shares of both A and B stock owned by them became vested in various persons. The trustee plaintiffs became vested with both A and B stock which, under the situation here present, created a conflict.
The assets of the corporation which were acquired prior to June 28, 1928 are now insufficient to establish a value of $375 per share. This resulted particularly from the depression of the 1930s and the resulting depreciation in investments made during the 1920s.
*392 It seems clear that although not designated "preferred," the A stock was essentially a preferred stock. It had preferential rights both as to capital and profits earned prior to June 28, 1928, and to capital and profits thereafter acquired to the extent of any deficiency resulting from a reduction in the value of the shares from their value on that date.
The specific defenses will be first considered before any attempt is made to dispose of the primary issues raised by plaintiffs.

1.

The questions here raised are moot, since they involve a speculative state of facts, and there is no justiciable controversy.
This defense raises the question as to whether this court may determine the question of construction, since the problem presented is allegedly contingent upon the happening of a hypothetical uncertain event. Generally, the law as stated by the defendants must be recognized as established. In order to reach a conclusion, however, we must apply the law to the particular facts, as pleaded.
The plaintiffs fall into two categories: (1) as trustees, and (2) as corporation.
As to the trustees: There can be no doubt that where a trustee's individual private interests may conflict with the interests of the trust estate, it is not only his right but his duty to apply to this court, under its general equity powers, for instructions. Shanley v. Fidelity Union Trust Co., 5 N.J. Misc. 783 (Ch. 1927); Fidelity Union Trust Co. v. Cory, 9 N.J. Super. 308 (Ch. Div. 1950). The trustees find themselves in such a conflict.
As to the corporation: The plaintiffs rely upon R.S. 2A:16-50 et seq., the Declaratory Judgment Act, as their authority for this construction. R.S. 2A:16-53 provides:
"A person interested under a deed, will, written contract or other writing constituting a contract, or whose rights, status or other legal *393 relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder."
The Declaratory Judgment Act broadens remedies long recognizable in a court of equity. It is a supplement to but not a substitute for existing remedies, and is designed to "declare rights, status and other legal relations." This may be accomplished before any rights have actually been invaded or any wrongs have been actually committed. Weissbard v. Potter Drug & Chemical Corp., 6 N.J. Super. 451 (Ch. Div. 1949); Empire Trust Co. v. Board of Commerce, &c., 124 N.J.L. 406 (Sup. Ct. 1940); New Jersey Turnpike Authority v. Parsons, 3 N.J. 235 (1949). There must be an actual controversy between a plaintiff and a defendant having an interest in opposing his claim. The action must be adversary in character. The controversy must be bona fide and not one in which "the semblance of judicial proceedings and the form of due process are present." New Jersey Turnpike Authority v. Parsons, 3 N.J. 235 (1949); New Jersey Bankers Ass'n v. Van Riper, 1 N.J. 193 (1948). The statute is remedial and should be liberally construed. R.S. 2A:16-51.
A certificate of incorporation is a contract both as between itself and its stockholders, as well as between the stockholders inter sese. Faunce v. Boost Co., 15 N.J. Super. 524 (Ch. Div. 1951); Warren v. 536 Broad Street Corp., 6 N.J. Super. 170 (App. Div. 1950).
It is plain that without a construction such as the corporation here seeks there is no firm basis upon which the value of the stock of a retiring or deceased stockholder can be ascertained. The solution of the problem here raised is vital in the light of those provisions. It is neither contingent nor hypothetical. There is here present such an actual controversy as is required for this court to obtain jurisdiction.
*394 Not only does the court have jurisdiction to determine the controversy in order to give the trustees the repose to which they are entitled because of the predicament in which they find themselves, both by virtue of its general equity powers and the provisions of the Declaratory Judgment Act, but the corporation may, as well, obtain the relief it here seeks by virtue of the Declaratory Judgment Act. This defense is therefore held to be without merit.

2.

This court has no jurisdiction, since the question involves a foreign corporation.
The question of whether the New Jersey courts will assume jurisdiction over the internal affairs of a foreign corporation is one more of discretion than of jurisdiction. When, as here, the corporation is foreign in origin only, resulting from incorporation in a foreign state, but whose business is actually conducted, and its books and records are located in this State; whose directors' and stockholders' meetings are here held, and whose stockholders, directors and officers are residents of this State and subject to process issued by New Jersey courts, the courts of this State may assume jurisdiction and grant the relief demanded. Mayer v. Oxidation Products Co., Inc., 110 N.J. Eq. 141 (Ch. 1932); Hill v. Dealers' Credit Corp., 102 N.J. Eq. 310 (Ch. 1928); Appleton v. Worne Plastics Corp., 140 N.J. Eq. 324 (Ch. 1947).
The corporate plaintiff in the present suit meets all of these qualifications. This defense is as well held to be without merit.
Having disposed, primarily, of the jurisdictional defenses, it becomes necessary to determine the actual issue.
The purpose of the amendment and the several contracts clearly demonstrate that what Hungerford, Sr. and his wife desired to accomplish was to furnish a profit incentive to certain employees of the plaintiff corporation by *395 giving them an interest in the business done and the business assets acquired after June 28, 1928. All of the assets acquired prior to that date were to remain the sole property of the original stockholders. The family corporation which, in actuality if not in legal concept, was a corporation sole, was admitting new non-family member stockholders, who were thereafter to receive not only remuneration by way of salaries, but were as well to enjoy the fruits of their labors by a participation in the profits which they helped to acquire. However, the original stockholders were desirous of maintaining a minimum preferential financial interest, to the extent of the value of their stock on that date. They were desirous of retaining the profits earned under their exclusive management. If this were not so, there would have been no need and necessity for establishing the value of $375 and making specific reference thereto in the amendment. Had the scrivener been content with paragraphs (a) and (b) and the definition of the word "surplus" set forth in paragraph (e), and had he added no further provisions, the plaintiffs could not possibly have pointed to any alleged ambiguity. The balance of these sections, when viewed in the light of all of the provisions of the amendment, present no real or actual ambiguity. Implicit in the provisions of paragraphs (c), (d), (e) and (f) are the provisions of paragraphs (a) and (b). The paragraphs following (a) and (b) serve only to clarify the interest of B stockholders by clearly enunciating their rights to participate in the "surplus" obtained subsequent to June 28, 1928, both by way of dividends and capital increase. These rights were always subject to the preferential interest of A stockholders to a capital valuation of $375 per share. In effect, there was a guaranty that the accumulated profits of the original stockholders would not be in any way diminished by the amendment.
There can be no doubt that "book value" as referred to in the contracts, is to be ascertained with "surplus" in mind, as defined in said amendment.
*396 Plaintiffs have referred to the method in which the books of the corporation were set up to bolster their argument of an existing ambiguity and to show a contemporary construction.
The argument of plaintiffs in an attempt to demonstrate ambiguity, although interesting and demonstrating the legalistic ability of counsel, must fail when viewed in the light of the actual language of the instrument itself.
In Corn Exchange, &c., v. Taubel, 113 N.J.L. 605 (E. & A. 1934), the court said:
"The standard of interpretation of an integrated agreement supported by the weight of modern authority, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the writing, other than oral statements by the parties of what they intended it to mean, except where it produces an ambiguous result, or is excluded by rule of law establishing a definite meaning. 1 Contracts A.L.I., § 230. This has been termed a primary rule of interpretation which is always applicable, whether the writing seems clear or ambiguous. Williston on Contracts, §§ 617, 618. The underlying theory is that as all language will bear `some different meanings,' evidence of surroundings is always admissible in the interpretation of integrated agreements, but not for the purpose of giving effect to an intent at variance with any meaning that can be attached to the words. 1 Contracts A.L.I., p. 324. But, however this may be, the propriety of admitting evidence of extrinsic facts, where the meaning of the instrument is not clearly apparent, cannot be gainsaid. Where, as here, general or indefinite terms are employed in the agreement, the court may look into the attending circumstances, and avail itself of such light as they may afford in ascertaining the true meaning of the language so used. Basic Iron Ore Co. v. Dahlke, supra; Fletcher v. Interstate Chemical Co., 94 N.J.L. 332; 1 Contracts A.L.I., § 235. In such a situation the court must regard the relation of the parties and the circumstances under which the contract was made, and the objects which the parties were thereby striving to accomplish. Such an inquiry is not for the purpose of changing the writing, but to secure light by which to ascertain its actual significance. Walker v. Brown, 165 U.S. 654, 17 S.Ct. 453, 41 L.Ed. 865. It must always be kept in mind that, in an action on the contract, such evidence is admissible only for the purpose of interpreting the writing  not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the instrument. So far as the evidence tends to show not the meaning of *397 the writing, but an intention wholly unexpressed in the writing, it is irrelevant. Williston on Contracts, § 629; 1 Contracts A.L.I., § 235."
"The interpretation of the contract given by the parties themselves, as shown by their conduct, such as their acts in partial performance, will be adopted by the courts. Basic Iron Ore Co. v. Dahlke, supra; Bellisfield v. Holcombe, 102 N.J. Eq. 32; Reed v. Inhabitants of Trenton, 80 Id. 503; Naughton v. Elliott, 68 Id. 259. But where the meaning of the contract is plain, there cannot be a contrary construction by the acts of the parties. Williston on Contracts, § 623. It is the established rule in this State that it is only where the language is of doubtful meaning that parol evidence of the practical interpretation by the acts of the parties may be received to remove the doubt. This is termed a secondary rule of construction. Its object is to ascertain the true meaning of the words in a written contract, about which there is doubt. Stewart ads. Lehigh Valley Railroad Co. [v. Stewart] 37 N.J.L. 53; Reed v. Inhabitants of Trenton, supra. The practical construction thus given by the parties is a clue to their intention, and is admissible for this purpose solely, where the language employed permits of more than one construction. The most recent statement of the rule is that if the conduct of the parties, subsequent to a manifestation of intention, indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation. 1 Contracts A.L.I., § 235. But while the acts of the parties cannot support a construction contrary to the plain meaning of the language used, such conduct may be evidence of a subsequent modification of their contract. 1 Contracts A.L.I., § 235; Williston on Contracts, § 623."
There being no ambiguity, there is no reason to consider the alleged contemporary construction placed upon the agreement as evidenced by the bookkeeping method employed. If the accountant set up the books on any other basis than that the A stock had a basic value of $375 per share before B stock was entitled to participate in capital, he was in error. Doubts or ambiguities may not be raised by way of erroneous bookkeeping methods set up in a manner not warranted and may not, under such circumstances, be considered to show an interpretation of the parties in the face of the clear language of the instrument sought to be construed. There being no ambiguity, the reason for a construction ceases and the proof of alleged contemporary construction becomes inadmissible. Williston on Contracts, sec. *398 623, p. 1794; Wecoline Products, Inc., v. Carman & Co., Inc., 125 N.J.L. 480, 15 A.2d 600 (E. & A. 1940); Corn Exchange, &c., v. Taubel, 113 N.J.L. 605 (E. & A. 1934); Casriel v. King, 2 N.J. 45 (1949).
It is to be noted that plaintiffs have not alleged a modification, and so the testimony for this purpose will not be received nor considered.
Judgment will therefore be entered construing the amendment to mean that the A stockholders are entitled, upon dissolution or liquidation, to first receive $375 per share out of the assets of the corporation. Thereafter, the A and B stockholders share equally in the remaining balance, and the trustees are directed not to consent to the proposed further amendment of the certificate of incorporation.