41 N.J. Super. 259 (1956)
125 A.2d 10
THE TRUSTEES OF RUTGERS COLLEGE IN NEW JERSEY (A BODY CORPORATE AND POLITIC HERETOFORE DESIGNATED THE STATE UNIVERSITY OF NEW JERSEY), AND JOHN H. BOSSHART, CHARLES H. BROWER, ROBERT A. COOKE, MARIE H. KATZENBACH, ROSAMOND S. MOXON, ROY F. NICHOLS, CARROL M. SHANKS, LANSING P. SHIELD, FREDERIC W. SMITH, HOWARD A. SMITH, TRACY S. VOORHEES AND RALPH P. WHITE, INDIVIDUALLY AND AS MEMBERS OF AND REPRESENTATIVES OF THE MEMBERSHIP OF THE BOARD OF TRUSTEES OF THE CORPORATE PLAINTIFF AND AS MEMBERS OF A SPECIAL COMMITTEE OF THE BOARD ON THE REORGANIZATION OF THE BOARD OF TRUSTEES, PLAINTIFFS,
v.
GROVER C. RICHMAN, Jr., ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, ROBERT L. FINLEY, ACTING AND DEPUTY TREASURER OF THE STATE OF NEW JERSEY, AND THE STATE BOARD OF EDUCATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 3, 1956.
*265 Mr. Waldron M. Ward argued the cause for plaintiffs (Messrs. Pitney, Hardin & Ward, attorneys for plaintiffs; Mr. Roger C. Ward, on the brief).
Mr. Grover C. Richman, Jr. and Mr. David D. Furman argued the cause for defendants (Mr. Grover C. Richman, Jr., Attorney-General of New Jersey, attorney for defendants; Mr. David Landau on the brief).
Mr. Samuel A. Larner and Mr. Roger H. McGlynn argued the cause as amici curiae.
SCHETTINO, J.S.C.
Plaintiffs move for summary judgment on the record which comprises the amended and supplemental complaint, with exhibits annexed; the answer thereto; affidavits of nine individuals; a certified copy of the corporate plaintiff's charter and all amendments thereto; a certified copy of Charter Provisions and Rules and Regulations (1951 edition); and the text of chapter 61 of the Laws of 1956.

HISTORY, NATURE AND ORGANIZATION OF RUTGERS
Rutgers University has its origin in Queen's-College, chartered by George III of Great Britain in 1766 in response to a petition of Dutch settlers of New York and New Jersey. It was organized under an amended charter dated March 20, 1770, and instruction commenced in 1771, at New Brunswick.
*266 The original charter provided:
a. The right and power to establish and conduct a college
"For the education of youth in the learned languages, liberal and useful arts and sciences, and especially in divinity; preparing them for the ministry and other good offices";
b. The provision that the President shall be a member of the Dutch Reformed Church;
c. The incorporation of the Trustees in perpetuity, under the name "Trustees of Queen's-College in New Jersey," with appropriate corporate powers;
d. Full power in the Trustees over the government of the college, to make "ordinances, orders and laws" for the government of the college, and to execute the same;
e. Election by the Trustees of a President, a Professor of Divinity, professors and tutors, treasurer, the clerk, the steward, and other inferior officers and ministers to serve during the pleasure of the Trustees;
f. The membership of the Trustees, originally consisting of the Governor or Commander-in-Chief, the President of the Council, the Chief Justice and the Attorney-General of the colony for the time being, and 37 named Trustees of the Colony of New Jersey and the Provinces of New York and Pennsylvania, without stated term, with power in
"The said Trustees, or any twelve, or greater number, * * * to elect * * * any number of persons or trustees, at any, and upon any vacancy, so that the whole number of trustees do not exceed forty-one, and that not above one-third of the said number, at any time, be of those ordained ministers of the gospel."
After the American Revolution the charter was amended and confirmed by the State of New Jersey in 1781 upon petition of the Board of Trustees, an interesting change being the removal of the one-third restriction upon ordained ministers as trustees. Wilson's Laws, p. 192. Again in 1799 upon the Board's petition the charter was amended in minor respects and confirmed. Paterson's Laws, p. 384. In 1825 the name was changed to "The Trustees of Rutgers *267 College in New Jersey" in recognition of Colonel Henry Rutgers, a generous donor, and the charter was amended in minor respects. L. 1825, p. 44.
Originally the trustees were shackled by a limit that the institution's property holdings could not exceed £ 3,000 sterling yearly value. This limitation was raised to $100,000 by L. 1869, c. 224, a limitation since removed by general law. The preamble of this statute recited
"that it is desirable and necessary for the purpose of better carrying out the benevolent and laudable designs of the founders of the institution, and for promoting the liberal views of the state, in regard to the advancement of agricultural science in all its various branches, that the value of the property which the said trustees are authorized to hold, shall be increased."
For the purpose of complying with the so-called "First Morrill Act," 12 Stat. 503 (1862), 7 U.S. Code, secs. 301, 304 (1946), the New Jersey Legislature, by the Laws of 1864, chapter 369, designated the Rutgers Scientific School, a department of the college, as the "New Jersey Land Grant College"; and it was thereafter referred to as the "Agricultural College," or by similar terminology. As such it was made subject to the "general powers of supervision and control" of a Board of Visitors created for the purpose and appointed by the Governor. In 1917, when the Agricultural College was designated the "State University of New Jersey," it continued under the same general powers of supervision and control of the Board of Visitors. L. 1917, c. 32; R.S. 18:22-15.
The formal excision from the charter of all religious and sectarian qualifications both generally and with specific reference to the President's membership in the Reformed Church in America and to the maintenance of a professorship of divinity, was made by Board resolution of 1920.
In 1927 the Board increased the number of ex officio trustees from three to seven by adding the Chancellor, the President of the Senate, the President of the State Board of Education, and the Commissioner of Education for the purpose *268 of promoting "a closer cooperation in educational work between this institution and the other educational agencies of the State of New Jersey."
In 1928 the Legislature adopted a joint resolution (L. 1928, p. 792) appointing a commission "to examine the existing relations of the State with Rutgers University and to recommend to the present Legislature [or to the succeeding Legislature] such reorganization and means of adequate support as may be deemed to be to the best interests of the State." After hearings and full consideration, the commission reported that "Rutgers has rendered most valuable service to the State in its work of higher public education"; reported against disturbing "radically" the relation between Rutgers and the State and, in particular, against an attempt to create a "distinctive State University" accomplished by a reorganization of the Board of Trustees providing for membership thereon of a majority who should be appointed by the Governor, and recommended that the New Jersey State Board of Regents be created,
"who shall be charged with the care, custody and control of such property as the State now has or shall hereafter acquire at Rutgers or at any other institution of higher education receiving State aid; * * *"
and that the Regents should meet at least once a year
"with the Board of Trustees of said institution in order that it may effect a complete coordination between the Board of the privately chartered institution and its operation as an instrumentality of the State."
This recommendation was enacted into law by Laws of 1929, chapter 76; R.S. 18:22-1. Subsequently the Board's powers were in effect transferred to the State Department of Education. L. 1945, c. 51; L. 1945, c. 211; N.J.S.A. 18:2-1 et seq., 18:2-1, 1.1.
Chapter 77 of the Laws of 1929, R.S. 18:20-1, as amended by Laws of 1946, chapter 289, N.J.S.A. 18:20-1 forbids the adoption by any educational institution of any title containing the words "New Jersey" or "State" except schools *269 maintained by the State Board of Education or other state departments and the State University of New Jersey.
Finally, in 1945 Rutgers was recognized by the State and the Board of Trustees as a university, the State University, an instrumentality of the State; and all its parts became subject to a public trust for higher education under the general superintendence of the State Board of Education. See generally L. 1945, c. 49, c. 51 and c. 212; Board Resolution of 1945.
During Rutgers' corporate evolution, its scholastic origin was distinctly classical and professional and we find that the first 50 graduates whose occupations are recorded in the University's General Catalogue of 1916 included 23 clergymen, 9 lawyers, 6 educators, and 3 physicians. Gradually the curriculum broadened to encompass modern languages, the several branches of science (in 1830 a professor of chemistry was appointed), history and the social sciences.
The "First Morrill Act," 12 U.S. Stat. 503 (1862), 7 U.S.C., sec. 301 (1946), required that in the division of Rutgers which was designated as the State's land-grant college "The leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life."
New Jersey by Joint Resolution No. 8, Laws of 1858, requested the State's congressional delegation "to use their best exertions to obtain from the general government a donation of public lands, to this state * * * for the founding and maintaining * * * of an agricultural college for the promotion of the science and practice of agriculture."
The Rutgers Scientific School was designated and did carry out the purposes of that act and receive the federal grants thereunder, L. 1864, c. 369. A further grant of federal aid was made, accepted and used under the "Second Morrill Act" for "instruction in agriculture, the mechanic arts, the *270 English language and the various branches of mathematical, physical, natural and economic science, with special reference to their applications in the industries of life," 26 U.S. Stat. 417 (1890), 7 U.S.C., sec. 321 et seq. (1946); L. 1891, c. 4.
The New Jersey Agricultural Experiment Station was established in 1880 by the Legislature, L. 1880, c. 106, "for the benefit of practical and scientific agriculture, and for the development of our unimproved lands" and as part of the federal grant-in-aid program, 24 U.S. Stat. 440 (1887), 7 U.S.C., sec. 362 et seq. (1946); L. 1887, c. 16; L. 1888, c. 97. The Experiment Station and associated units carried out research in oyster propagation, sewage disposal and poultry husbandry, analysis of milk, butter and other farm products for the State Department of Health, instruction in ceramics, engineering, chemistry, physics and biology, and extension work in agriculture and home economics. See L. 1945, c. 49.
By various other legislative and corporate enactments Rutgers established the New Jersey College for Women (1918, 1919), now Douglass College, and established, or absorbed other existing schools offering, curricula in aeronautical engineering (1920), education (1923), extension work (1925), pharmacy (1927), evening classes (1934), law (1946), arts and sciences (1946), business (1946), management and labor relations (1947), social work (1947) and microbiology (1949). The inclusion of law, business, and arts and sciences curricula in 1946 resulted from the merger in that year of the University of Newark, which institution had brought about a merger of various other schools in 1936. L. 1946, c. 217; N.J.S.A. 18:22-15.14. The Paterson College was established within the University in 1947 to offer arts and sciences on the undergraduate level. L. 1947, c. 139; N.J.S.A. 18:22-15.16, 15.17. In the same year the State Teachers College was integrated with the University. L. 1947, c. 140; N.J.S.A. 18:22-15.18. The junior college and law school of the College of South Jersey were merged in 1950. L. 1950, c. 116; N.J.S.A. 18:22-15.23.
*271 Federal grants starting in 1864 were made available to Rutgers by the Legislature. They included Rutgers' scholastic activities as the State's land-grant college under the First and Second Morrill Acts and the subsequent federal legislation, including the Hatch Act, 24 U.S. Stat. 440 (1887), 7 U.S.C., sec. 362 et seq. (1946); the Adams Act, 34 U.S. Stat. 63 (1906), 7 U.S.C., sec. 369 (1946); the Nelson Amendment, 34 U.S. Stat. 1281 (1907), 7 U.S.C., sec. 322 (1946); the Smith-Lever Act, 38 U.S. Stat. 372 (1914), 7 U.S.C., sec. 341 et seq. (1946); the Purnell Act, 43 U.S. Stat. 970 (1925), 7 U.S.C., sec. 370 (1946); the Capper-Ketcham Act, 45 U.S. Stat. 711 (1928), 7 U.S.C., sec. 343a (1946); and the Bankhead-Jones Act, 49 U.S. Stat. 436-439 (1935), 7 U.S.C., sec. 329, 343c (1946). From time to time the Legislature has made these various federal grants available to Rutgers. See L. 1864, c. 369; L. 1888, c. 97; L. 1891, c. 4; L. 1895, c. 417; L. 1906, c. 204; L. 1915, c. 155; L. 1925, c. 183; L. 1929, c. 36; and Assembly Concurrent Resolution No. 2, 1936. The amounts range from $46,480 in 1900 to $685,262 in 1956.
Concurrently the State was making its own funds available to the University through the State Agricultural College for various specific purposes, for example, study in ceramics (L. 1902, c. 17; L. 1920, c. 36, cf. R.S. 18:22-41); a short course in agriculture (L. 1905, c. 55, cf. R.S. 18:22-33); and study in aeronautical engineering (L. 1920, c. 21, cf. R.S. 18:22-43). In addition, appropriations were made under the general appropriation acts, the amounts of which range from $34,940 in 1910 to $10,356,303 in 1956. Until 1945 the appropriations were earmarked for the State Agricultural College, the Agricultural Experiment Station and the New Jersey College for Women. From 1945, when the entire University became the State University, L. 1945, c. 49, the appropriations were made generally available.
In 1890 the Legislature established state scholarships, L. 1890, c. 108, to supplement the scholarships which had been provided from the federal grants since 1866. Originally *272 the amounts payable thereunder were equal to the federal scholarships. L. 1890, c. 108, sec. 3. In 1920 the annual amount of each scholarship was fixed at $200. L. 1920, c. 113. Payments have regularly been made under general appropriation acts; and since 1945 the amounts and administration of the state scholarships have been regulated by contract.
The total operating account for the year ending in 1950 increased 180% over that for the year 1945, and the state appropriations for operations increased in about the same proportion. In 1950-1956 the increase in operating account has been approximately 50%, whereas the state appropriations have increased over 125%. The heavy participation of the State in the increase of the past six years is a striking feature. Over the years 1950-56 the operating account has increased $6,555,166. Of this increase $5,949,000 (or 90.7%) was provided by increased state appropriations, while the University provided only $478,339 (or 7.3%) of the increase from internal sources.
Capital contributions by the State for new plant and facilities of the University, as measured by appropriations, have for the past several years been approximately $2,000,000 per annum, though actual receipts have been lower due to construction schedules. For the past few years, aside from a grant of $3,500,000 to establish the Institute of Microbiology, and a bequest of $1,800,000 to establish a program in government and political science, capital contributions from private sources have ranged from $600,000 to $1,200,000 per annum.
Rutgers is today a university, "an instrumentality of the state for providing public higher education," and its property and educational facilities are impressed with a "public trust for higher education of the people of the State." L. 1945, c. 49, secs. 1, 2; N.J.S.A. 18:22-15.1; 15.2; L. 1956, c. 61, sec. 3, approved June 1, 1956, entitled "Rutgers, The State University Act of 1956."
It is centered in New Brunswick, with branches in more than a score of other municipalities in New Jersey, consisting of 21 colleges and divisions at graduate and undergraduate levels. Rutgers offers higher education in liberal arts through *273 the University College (in four divisions at New Brunswick, Newark, Paterson and Camden), Douglass College (the women's college), the College of South Jersey, the Graduate School and the General Extension of the University Extension Division, in journalism, chemistry, engineering, education, physical education, military education, pharmacy (including a pharmaceutical extension service), nursing, business administration and ceramics; in agriculture, including the New Jersey Agricultural Experiment Station and an extension service in agriculture and home economics.
On the specialized advance level, instruction is offered by Rutgers in law (including the South Jersey Division), library service, social work, banking, management and labor relations, sales management and retailing.
Rutgers operates the Institute of Microbiology, the Psychological Clinic and Reading Center and the Bureaus of Economic Research, Mineral Research, Government Research and Biological Research, the University Library and the Rutgers University Press.
Rutgers has many millions of dollars worth of facilities and endowments. As of April 30, 1956 Rutgers shows endowment assets at $10,767,000; land, buildings and equipment at $69,330,000; other plant assets at $3,846,000; loan fund assets at $230,000; and current assets at $5,312,000. The total of $89,445,000 is conservatively estimated, for the most part at book value (cost) or on the basis of a 1947 appraisal.
Rutgers' total income for the fiscal year ending June 30, 1955, was $18,887,381. One-half of this amount was appropriated by the State. The endowment funds administered by the Board of Trustees (aggregating $10,483,400 in principal amount at book value exclusive of building funds on June 30, 1955) produced an additional annual income of $407,712. The remainder of the operating income was derived from payments by students of $5,483,593, and payments from other sources of $3,483,300 made up mainly of federal appropriations of $685,262; grants or reimbursements for research of $1,400,000; sundry temporary funds *274 of $796,000; income from the Rutgers University Press of $170,987; alumni annual giving of $75,000; and miscellaneous operating income.
The current income and expenditure figures for the ten months ending April 30, 1956, are relatively even higher. The partial-year income was $19,469,417, comprised of $10,155,074 of state appropriations; $793,160 of federal funds; $5,539,153 in student payments; $424,657 in endowment income; $64,086 from alumni giving; $108,701 income from the Rutgers University Press; and $2,384,578 from other sources.
The total appropriation for 1955-56 was $10,362,103.23 exclusive of capital contributions. The appropriated capital contribution was $800,000 plus unexpended prior capital appropriations. L. 1955, c. 95, pp. 431, 537. The 1956-57 figures are $10,548,405 and the amount of unexpended prior capital appropriations, respectively. L. 1956, c. 100.
Management of the University is in the Board of 54 Trustees consisting at present of 53 persons. Thirty-two of the number are classified as charter trustees, of whom 30 hold indefinite terms and two (women) hold a five-year term; and seven persons are elected by the Board of Trustees for five-year terms on the nomination of the alumni and alumnae of the University. Five trustees are classified as public trustees appointed to five-year terms by the Governor of the State with the advice and consent of the Senate. The balance of the membership comprises nine trustees ex officio (officials of the State Government), and the president of the New Jersey Federation of Women's Clubs (ex officio by election by the Board). L. 1945, c. 49, sec. 4; N.J.S.A. 18:22-15.4; Charter Provisions and Rules and Regulations. The Board of Trustees itself fills vacancies in the number of charter and alumni trustees. The Board appoints, removes and replaces the President, faculty and other officers and employees of the University, and also the Board of Managers of the New Jersey Agricultural Experiment station. The officers and the Board of Managers are accountable to the Board for the conduct of the University. L. 1945, c. 49, sec. 5; N.J.S.A. *275 18:22-15.5. The chairman of the Board appoints the various standing committees and special committees, through which the Board largely exercises its supervision and control of the conduct of the University, and which are also accountable to the Board. The President is the chief administrative officer of the University and has the immediate care of the education and government of the students. The Board maintains a general oversight of the curricula of the institution in all of its divisions and establishes ordinances, orders and laws for the University to be executed by the President. (Charter Provisions and Rules and Regulations)
Internal control of the University by the Board of Trustees is subject to certain public supervision by the State Board of Education "to examine into its manner of conducting its affairs and to enforce an observance of its laws and regulations and the laws of the State." L. 1945, c. 49, sec. 8; N.J.S.A. 18:22-15.8; in addition, the property of the State which the Board of Trustees holds at the University is subject to the visitorial power, Ibid., sec. 9; N.J.S.A. 18:22-15.9, and
"The State Board of Education shall investigate and jointly with the State University of New Jersey make recommendations to the Governor and the Legislature respecting the needs for the facilities and services of the State University of New Jersey as an instrumentality of the State for providing public higher education and thereby to increase the efficiency of the public school system of the State." Ibid., sec. 10, N.J.S.A. 18:22-15.10.
The State Board of Education has express responsibility and authority with respect to the University's budget under L. 1945, c. 51, sec. 2; N.J.S.A. 18:2-4(r), to "advise with the State University of New Jersey regarding its annual budget * * * and jointly with the State University make recommendations to the Governor and to the Legislature in support of such budget * * *." Pursuant to that section and to section 6 of the 1945 act, L. 1945, c. 49, sec. 6; N.J.S.A. 18:22-15.6, the State Board of Education annually makes contracts with the University which deal not only with the disposition of the budget but also with matters of admissions, tuitions and state scholarships.

*276 THE PRESENT AND FUTURE SITUATION OF RUTGERS AS A STATE UNIVERSITY
The University states it is even now unable to meet the full measure of demand for its services, and the demand is certain to intensify in the predictable future far beyond its present capabilities. Many factors are at work: the upward population trend due both to an increased birth rate and immigration into the State; a decline in the out-of-state facilities open to New Jersey students and a relative inadequacy of private facilities within New Jersey; a heightened desire and ability in the general public to provide their children with higher education; the diversity of economic activities in New Jersey leading to the need for manifold technical training; a decline in the proportionate amount which the students themselves contribute to the steadily and materially increasing cost of education; and relative inadequacy of the University's own financial resources and of private donations to higher education in general.
Studies of the birth rate and census by experts show that the college-age population of New Jersey is estimated to increase from 239,000 in 1954-1955 to 517,000 in 1973-1974, or an increase of approximately 215%. The State Department of Education predicts an increase of approximately 180% over the years 1955-1970. Moreover, college education is ever more widely desired and falls within the financial reach of wider segments of the people of the State; thus, the Commissioner of Education estimates that in 1973 30% of the college-age group will want to go to college as compared with 18% in 1954.
In the face of that trend, New Jersey students will find less, rather than more, opportunity to go to college in sister states. This is an obvious result of the same pressures at work in the other states, leading them naturally to prefer their own residents over New Jersey students. Our State Commissioner of Education reports that New Jersey exports 55% of its college students, more than any other state in the nation.
*277 The Commissioner of Education's data indicate that in 1973 100,000 young men and women will be in the college level, of which only 16,000 could be accommodated under present circumstances, leaving a potential deficit of 84,000. The 100,000 group is approximately two-thirds of the total of 155,000 seeking college education in 1973, and is the balance of the total after allocation of 25,000 to private institutions in New Jersey, 3,300 to out-of-state public institutions and 26,200 to out-of-state private institutions. One of plaintiffs' experts predicts that potential enrollment in public institutions in New Jersey by 1970 will have quadrupled as compared to a two-fold increase for the entire country. With respect solely to its new applicants for admission (a fractional part of total college enrollment), the University was recently reported to expect its number of applicants to double in the next eight years and eventually to reach 12,000. The impact of these trends even now is exemplified in the same report, to the effect that in the academic year 1955-56 25% of the applicants for admission to the college were admitted (875 of 3,600 applicants); and in the year 1956-57 only about 20% can be admitted (925 of 5,500 applicants).
Despite the liberal and increasing appropriations of the State to Rutgers in particular, New Jersey ranks only 44th among the 48 states in percentage of per capita income spent for higher education. Nevertheless, with one or two special exceptions state capital contributions have been both larger and more consistent than private capital contributions. The record shows that the amounts which the students themselves can contribute to the cost of their education are relatively declining in the face of increasing costs, due in large part to increased costs of plant maintenance, replacement and improvement, increased salaries and wages, and the complexity and variety of the curriculum and the equipment needed to implement it, especially in the scientific field; that income from student fees and auxiliary services has actually declined in the past half-dozen years despite an increase of 20% in gross enrollment, and income from *278 endowments, gifts and special funds has increased comparatively little. As a result it has been necessary to appeal to the State for 91% of the University's multimillion-dollar current account expansion.

CHANGES IN RUTGERS UNDER THE PROPOSED REORGANIZATION
Chapter 61 of the Laws of 1956 was approved by the Governor, Honorable Robert B. Meyner, on June 1, 1956, after passage by the Legislature in May; the Senate voting 19-0 and the Assembly 50-1. This act known as "Rutgers, The State University Act of 1956," embodies the proposed reorganization of the University. It will become void unless the Board of Trustees in its discretion accepts and adopts its provisions prior to September 1, 1956 (L. 1956, c. 61, sec. 37).
While retaining the University's objects and purposes, the act amends the charter and modifies its structure in a number of substantial respects. The act provides for a Board of Governors for the University which will supersede the Board of Trustees in the general supervision and conduct of the University.
The Board of Governors shall consist of two ex officio members without vote, i.e., the Commissioner of Education of New Jersey and the President of Rutgers, and 11 voting members. Of the 11, a majority of six shall be appointed by the Governor of New Jersey with the advice and consent of the Senate, and the minority of five shall be appointed by the Board of Trustees from among the charter, alumni and alumnae trustees, each for a six-year term; they may succeed themselves for one additional six-year term and are appointed to staggered terms (sec. 7). Removal from the Board of Governors for malfeasance or conduct injurious to the interests of the University is provided by action of a majority of the Board, subject to review by the appointing authority, either the Governor or the Board of Trustees, as the case may be (sec. 12(a)). The *279 Board of Governors shall have general supervision over and be vested with the conduct of the University; specifically, power to determine policy and study the educational and financial needs of the University; preparation of the budget and presentation of it (jointly with the State Board of Education) to the Governor and Legislature; disbursement of all monies received from any source, including endowment income received through the Board of Trustees; the borrowing of money with the advice and consent of the Board of Trustees; planning, provision and construction of buildings, lands, materials, equipment and supplies; appointment, removal and compensation of all officers, faculty and employees of the University (in the case of the President, with the advice and consent of the Board of Trustees), and establishment with the approval of the State Board of Education of new educational departments or schools. The use and income of hitherto privately-donated properties, funds and trusts, the control of which is retained by the Board of Trustees, are made available to the Board of Governors and continued to be held impressed with a public trust for higher education (secs. 3, 18(3), 18(4), 19(I)(2), 20(II)). Title to properties continues in the corporate body excepting those which are in the name of the State.
The Board of Trustees is to retain important functions and powers of three distinct types. First, it shall act in an overall advisory capacity (sec. 19(I)(1)). Second, it shall have control of properties, funds and trusts vested in the corporate body as of August 31, 1956 (other than those, broadly speaking, owned by the State or derived from public sources) and of property, funds and trusts thereafter received by the corporate body which, again broadly speaking, the donor may be deemed to intend to entrust to the control of the Board of Trustees as such (sec. 19(I)(2)). Third, the Board of Trustees shall have the right to withhold or withdraw both of those two categories of property from the use and employment of the Board of Governors if such property is not properly applied to the purpose of public higher education, if the State fails to make sufficient provision *280 to permit the fulfillment of the Trustee's public trust through the conduct of a state university with high educational standards, or if certain other terms are not met. The Trustees' right of withdrawal can be exercised only
"after careful consideration and on not less than 60 days' prior written notice to the Board of Governors and to the State Board of Education or its successors, * * * subject to adjudication by the courts of the State, and (bb) subject to their proper application for the purpose of public higher education and in accordance with the terms of any applicable testamentary, trust or other special provision." (Sec. 20(II))
The Board of Trustees consists of the following: (a) two ex officio trustees without vote, namely the Commissioner of Education and the President of the Corporation; (b) the public trustees are increased from five to 11, being the five trustees provided for in Laws 1945, chapter 49, section 4; N.J.S.A. 18:22-15.4, plus the six appointees of the Governor to the Board of Governors, who automatically serve also as Trustees; (c) the alumni and alumnae trustees will remain at seven in number; and (d) lastly, the present 30 charter trustees with indefinite term will continue to serve until the incidence of vacancies reduces their number to 12, whereafter the number may be maintained at 12 by election of the Board, subject to the election by the Board of three women as charter trustees. All trustees hereafter elected except the ex officio trustees and the public trustees serving under the 1945 act shall serve for a six-year term, on a staggered basis, and may succeed themselves for one additional six-year term (secs. 8(I), 8(II)). Removal of trustees by the Board (other than the ex officio trustees) for malfeasance or conduct injurious to the interests of the Corporation or the University is provided for by action of the Governor in the case of his appointees, or by action of the Board in the case of its appointees (sec. 12(b)).
Each board is given incidental powers appropriate to its respective functions, without recourse to any department or agency of the State except as otherwise expressly provided *281 by the act or other applicable statute (sec. 21). Each board may adopt and amend pertinent by-laws, ordinances and statutes (sec. 22), and appoint and regulate the duties of standing, special and advisory committees of its members (sec. 23).
The executive management and conduct of the institution under the act remains lodged in the President, who shall be elected by the Board of Governors with the advice and consent of the Board of Trustees and shall hold office at the pleasure of the Board of Governors (sec. 27). Departure from the specified manner of electing the President is made one of the occasions permitting the Board of Trustees' withdrawal of its properties (sec. 20(II)(ii)(c)).
The act changes the name of the University from "The Trustees of Rutgers College in New Jersey" to "Rutgers, The State University." By express language as well as by intent, nothing in the act shall be deemed to create or constitute a debt, liability, or a loan or pledge of the credit, of the State of New Jersey (secs. 20, 34).
The basic relationship between the State and the Board of Trustees may be found in sections 3, 4, 18, 19(I) (2), and 20 of the act. Whereas since 1945 the facilities of the University have remained in the hands of the Board of Trustees impressed with a public trust and subject to the general superintendence of the State Board of Education, under the act the facilities and their use and income will be actually made available to and directly managed by a publicly controlled Board of Governors (secs. 18, 19(I)(2)). The State will receive effective control of an existing and established educational institution valued at many millions of dollars, plus the prospect of future donations. On the other hand, the Board of Trustees will have the State's solemn declaration of its policy that
"(i) the University shall be and continue to be given a high degree of self-government and that the government and conduct of the Corporation and the University shall be free of partisanship, and
(ii) that resources be and continue to be provided and funds be and continue to be appropriated by the State adequate for the conduct *282 of a State University with high educational standards and to meet the cost of increasing enrollment and the need for proper facilities." (Sec. 20(I))
and that
"* * * provision shall * * * be made by the State sufficient to enable the Board of Trustees to discharge its trust to apply the trust assets * * * for public higher education through the conduct of a university with high educational standards." (Sec. 20 (II) (iii))
and further that the assets controlled by the Trustee shall be properly applied and that the name of the University shall not be changed, nor provisions of the act for the essential self-government of the University be substantially altered, without the Board's consent.
We summarize the problems. By chapter 61 of the Laws of 1956, the Board of Trustees is called upon either to accept or reject a reorganization of the University as detailed in that act. Plaintiffs are trustees of a very considerable body of assets, for the most part derived from private donations in the cause of higher education over more than a century and a half and including also assets of substantial value derived from grants of the State of New Jersey and the Federal Government. Although Rutgers is at present the State University under the immediate management and control of the plaintiffs, the plaintiffs are in doubt, and need the instructions of this court, whether their duties and authority as such Trustees of the State University and its private and public assets encompass the effectuation of the changes which chapter 61 proposes to make in the University's charter and organization.
The two most basic questions presented are, first, whether chapter 61 is a constitutionally valid enactment upon which the plaintiffs may safely rely if they choose to accept its terms, and, second, whether the nature of their fiduciary duties permits them to exercise their choice in favor of accepting it.
*283 Defendants, Grover C. Richman, Jr., Attorney-General, Robert L. Finley, Acting and Deputy State Treasurer, and the State Board of Education acting in their public and official capacities, support the plaintiffs' motion for summary judgment.
The Attorney-General, Grover C. Richman, Jr., is joined as a party defendant (1) as the representative of the public interest in charitable trusts and in specific gifts, bequests and endowments to a charitable and educational corporation, namely, the plaintiff, and (2) because the constitutional validity and construction of legislation is drawn in issue.
The Attorney-General has a duty in this action to raise objections to any violation of the duties of the plaintiffs, The Trustees of Rutgers College in New Jersey, as charitable trustee. Passaic Nat. Bank & Trust Co. v. East Ridgelawn Cemetery, 137 N.J. Eq. 603, 608 (E. & A. 1946).
Acting and Deputy Treasurer Robert L. Finley is made a party defendant for the alleged reason that he is the head of the Department of the Treasury with general authority over and responsibility for state finances and revenues and the disbursements of appropriations of state funds, and that the Trustees of Rutgers College have been for many years past, and are now, the recipients of funds appropriated by the State for the purposes of higher education. Defendant, the State Board of Education, is joined because of its specific statutory duties respecting Rutgers University, including the approval of the annual budget and the visitorial function.
Samuel A. Larner, Esquire, and Roger H. McGlynn, Esquire, were appointed amici curiae by this court, not for the purpose or function of taking a position pro or con as an adversary in a litigated proceeding but rather to pose the issues raised by the nature of this litigation and assist the court in the determination of those issues.

I.
In their amended complaint plaintiffs seek two modes of relief: (1) a declaratory adjudication concerning the validity *284 of the Laws of 1956, chapter 61, and plaintiffs' actions thereunder, and (2) instructions as to the lawful exercise of their fiduciary duties.
I agree with counsel's position that the two avenues of relief although different, the difference between the two is virtually indistinct and that one procedural mode complements the other. As is set forth in Borchard, Declaratory Judgments (2d ed), at page 144:
"* * * The trustee's, executor's, or other fiduciary's bill for instructions, when adversary in character * * * is an exemplification of a traditional declaratory judgment."
It is well settled that a judicial proceding must be adversary in character, and not illusory or academic, so as to avoid giving advisory opinions or from functioning in the abstract. The principle of adversary proceedings is equally applicable to a declaratory judgment proceeding, and there must be an actual controversy existing between plaintiff and defendant.
In a declaratory judgment action, no wrong need be proved, but the mere existence of a claim or threat of a possible claim disturbing the peace or freedom of the plaintiff by casting doubt or uncertainty upon the plaintiffs' right or status establishes the requisite condition of justiciability. Plaintiffs have for many years acted as private Trustees for Rutgers College, and their decision to become an arm of the State raises serious questions concerning their actions. By such action they might possibly violate their fiduciary obligations. Such a possibility, coupled with the Attorney-General's status as protector of charitable trusts, creates a truly adversary proceeding. Chief Justice Vanderbilt stated the law succinctly in New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, at pages 239-240 (1949):
"The first question that confronts us is whether or not a proceeding under the Declaratory Judgments Act is available here. The remedial purpose of the Act is `to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations', R.S. 2:26-67. The Act merely broadens the rationale of remedies long cognizable in equity, such as those `to settle doubts *285 about the construction of a will * * *; or * * * to quiet title, or a bill of peace', In re Van Syckle, 118 N.J.L. 578, 580 (E. & A. 1937). To serve these ends it is provided that `All courts of record in this state shall * * * have power to declare rights, status and other legal relations,' R.S. 2:26-68, and particularly to determine `any question of construction or validity arising under * * * (a) statute * * *,' R.S. 2:26-69. The remedy thus provided, however, is circumscribed by the salutary qualification that the jurisdiction of the courts may not be invoked in the absence of an actual controversy. `Not only must the plaintiff prove his tangible interest in obtaining a judgment, but the action must be adversary in character, that is, there must be a controversy between the plaintiff and a defendant, subject to the court's jurisdiction, having an interest in opposing his claim.' Borchard, Declaratory Judgments (2d ed. 1941), p. 29; cf. New Jersey Bankers Ass'n v. Van Riper, 1 N.J. 193 (1948). We use the phrase `salutary qualification' because of the understandable policy of the courts to refrain from rendering advisory opinions, from deciding moot cases, or generally from functioning in the abstract, and `to decide only concrete contested issues conclusively affecting adversary parties in interest,' Borchard, pp. 34-35.
In the present proceeding highly significant issues that vitally affect the State and its citizens are presented for determination. That the plaintiff, New Jersey Turnpike Authority, has a clear interest in all phases of the challenged legislation sufficient to enable it to maintain this suit is too obvious to require comment. Similarly the State Highway Commissioner in the light of his general supervision over the construction and maintenance of state roads and highways, R.S. 27:1-1 et seq., is an indispensable defendant. His adverse interest is evident not only from the fact that the legislation under attack is generally in derogation of his jurisdiction but also because of his peculiar interest arising from the section making it possible for the Turnpike Authority to use the personnel and funds of his department for preliminary studies, R.S. 27:23-17. The Attorney-General who, in effect, concedes the constitutionality of the legislation is a necessary party by virtue of R.S. 2:26-72, which requires that he `shall also be served with a copy of the proceeding and be entitled to be heard' whenever a statute shall be alleged to be unconstitutional.
The first point to be considered in any proceeding for a declaratory judgment is whether or not the controversy that is presented in the briefs and at the oral argument is actual and bona fide or is merely one in which `the semblance of judicial proceedings and the form of due process are present.'"
Furthermore, a bill of instructions is an ancient device of the courts of chancery, and of course it was not necessary for such relief that an actual wrong had been committed. "Where the duty of a trustee is involved in doubt, it is his *286 right to ask and receive the aid and direction of a court of equity to the extent that his necessities may require." Traphagen v. Levy, 45 N.J. Eq. 448, 451 (Ch. 1889). A doubt existing, a trustee has a right to the aid of the court.
Historically, plaintiffs' right, as trustees, to declaratory relief is firmly established. 6 N.J. Practice (Clapp, Wills and Administration), sec. 621; p. 661; 90 C.J.S., Trusts, § 261(c), p. 311. Additionally, a fiduciary's position is such that it is peculiarly suited to declaratory relief. The purpose of such a proceeding is to terminate uncertainty.
In Borchard, Declaratory Judgments (2d ed.), at page 576, we find:
"The trustees' petition for instructions, when adversary, is one of the earliest forms of equitable declaration. Trustees are especially helped by the declaratory proceeding, because they thereby obtain the protection of a judgment before acting and have occasionally been advised by the courts, after having, to their regret, assumed risks, that the precaution of a declaratory judgment might have saved them both risk and loss."
In Hungerford & Terry, Inc., v. Geschwindt, 24 N.J. Super. 385 (Ch. Div. 1953), the trustees under a deed of trust sought relief under the general equity powers of the court, and a declaratory judgment as to the actions they should take in connection with a proposed or suggested amendment to a certificate of incorporation, stock of which corporation they held under a will. In denying the defense that no justiciable controversy was present and that the trustees were seeking appropriate relief, the court, 24 N.J. Super., at page 393 said:
"The Declaratory Judgment Act broadens remedies long recognizable in a court of equity. It is a supplement to but not a substitute for existing remedies, and is designed to `declare rights, status and other legal relations.' This may be accomplished before any rights have actually been invaded or any wrongs have been actually committed. * * * The statute is remedial and should be liberally construed. R.S. 2A:16-51."
See also Borchard, Declaratory Judgments (2d ed.), p. 576; New Jersey Turnpike Authority v. Parsons, supra (3 N.J. *287 235 (1949)), and Abelson's v. New Jersey State Board of Optometrists, 5 N.J. 412, 416 (1950).
I hold that a justiciable controversy is before me and that the issues presented are ripe for judicial determination.

II.
At the outset, it should be emphasized that this court is not called upon to determine the wisdom of the plan of reorganization as codified in L. 1956, c. 61; nor is it required to determine whether the trustees should or should not accept this plan or other alternate plans for the solution of the potential problems of the University in future years. Such conclusions constitute matters of policy for the Trustees, the Governor and the Legislature and do not concern the Judicial Branch of government. Our power is limited and is to pass upon the legal validity of the plan and the legislation. Hence, the basic problem for determination by the court is not whether the Trustees should proceed with the plan but whether the Trustees can legally proceed in the light of their powers under the charter and the applicable law.
The adoption by the Trustees of the provisions of L. 1956, c. 61 is a requisite to its being made operative. The statute is not in itself authority for the Trustees to consent to the Rutgers reorganization plan; whether that consent infringes their trust duties must be resolved upon principles of general trust law. Chapter 61, Laws of 1956, effects no change in the identity of the corporate trustee except that the name of the corporate trustee is changed from "The Trustees of Rutgers College in New Jersey" to "Rutgers, The State University." The Board of Trustees continues to control the trust property, assets and funds held and administered by it, subject to the requirement that the use and income from the various trusts be made available to the Board of Governors. The Board of Governors thereafter has the duty of continuing the management of the trust functions. I agree with defendants that the principal trust question which *288 appears, therefore, is the propriety in trust law of a plan which would reorganize an education institution for higher education, which had been governed by a single Board of Trustees, by severing the management function over the trust from that Board and vesting it in a new Board of Governors, a majority of whom are state appointees.
A principle of trust law is that trustees, having been chosen as such because of the confidence reposed in them and because of their special competence to effectuate the purposes of a trust, may not delegate important discretionary powers. 2 Scott on Trusts, sec. 171. Here the Governor and Legislature have provided for a shift in the major trust responsibility from the privately controlled Board of Trustees to the publicly controlled Board of Governors, both within the corporate trustee.
The first inquiry is directed to determining the nature of the "charitable trust" held and administered by the Trustees of Rutgers College in New Jersey. It is created by charter and must pursue the charitable purposes outlined in its charter and amendments thereto. Because donations to such corporations are made in reliance upon the fulfillment of those charitable purposes, a charitable corporation partakes for most purposes of the nature of a trust. The Trustees of Rutgers College are also trustees under specific trusts created for the charitable purposes of the corporation. Chapter 61 of the Laws of 1956 provides that terms of specific trusts will continue to be honored; special purpose trusts will continue to be served, and reversions, if any, honored.
By chapter 49 of the Laws of 1945, and the resolution of acceptance, the Trustees of Rutgers College in New Jersey agreed to impress all property, assets and funds held and administered by the corporation as trustee with a public trust for higher education of the people of the State. That public trust must be maintained pursuant to chapter 61, which discloses a strongly enunciated continuation of Rutgers' dedication to the purposes of higher education for the people of New Jersey. Necessarily, the accomplishment of the trust purpose is all important. A trust will not fail because of a *289 change in the identity of the trustee or the method of administration. Pennington v. Metropolitan Museum of Art, 65 N.J. Eq. 11, 22 (Ch. 1903); Briggs v. Merchants National Bank of Boston, 323 Mass. 261, 81 N.E.2d 827 (Sup. Jud. Ct. 1948). It is not likely that persons making gifts to the University do so in special reliance upon the fact that no change will be made in the management of the corporation, in view of numerous Rutgers' changes stated above.
Other factors strongly support the conclusion that the Trustees of Rutgers College in New Jersey would not breach their trust duties by adoption of L. 1956, c. 61. The Board of Trustees retains power to withdraw and withhold the use and income of the trust property, assets and funds, presently of the value of $89,000,000, from the Board of Governors in the event that its trust duties for the accomplishment of the trust purposes are not adequately discharged.
The Board of Governors, to whom substantial managerial powers would be delegated, is controlled through majority representation by persons designated by the Governor of the State of New Jersey with the advice and consent of the Senate.
The fundamental change brought about by the use of the additional governing body to be known as a Board of Governors is the granting of a greater voice in management to the State as a quid pro quo for greater financial support. Since the majority of voting members of the Board of Governors are appointed by the Governor of the State of New Jersey with the advice and consent of the Senate, the public is granted major control over the policies and administration of the university. Nevertheless, we note the strong statement of "public policy" that the University shall continue to be given a high degree of self-government, free of the partisanship which may be present in State Government. Thus we find here created a hybrid institution  at one and the same time private and public, with the State being granted a major voice in management, and *290 the designation "State University"; and the institution being granted private autonomy and control of physical properties and assets.
Under general legislation dealing with charitable and educational corporations, in the absence of a membership in such a corporation, the trustees are empowered to act in the case of an amendment to the charter or certificate of incorporation. R.S. 15:2-1. The Board of Trustees, by appropriate resolution, has assented to the plan of reorganization and has accepted the amendments to the charter contained therein, so that the constitutional hurdles evoked by the Dartmouth College case are not applicable. Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L.Ed. 629 (1819), reversing 1 N.H. 111 (1817). The opinion in that famous case was bottomed upon the lack of consent by the university; and the prohibition against the state prevented compulsory amendment against the will of the corporation itself. See In re Pennsylvania College Cases, 13 Wall. 190, 80 U.S. 190, 20 L.Ed. 550 (1872).
In the Case of St. Mary's Church (1822), 7 Serg. & R. (Pa. Sup. Ct.) 517, at page 547, the court stated:
"The power of assenting to amendments must rest somewhere; and it can, nowhere, be so conveniently or safely deposited as with the trustees, * * * All that was decided there [in the Dartmouth College Case] was, that the college should not undergo a violent transformation at the mere will of the Legislature; but it was not supposed by anyone, that if the assent of the corporation had been procured, the Act of Assembly would have been unconstitutional."
And in the same case Chief Justice Tilghman stated, 7 Serg. & R., at pages 537-538:
"I grant, that if the clergy had consented; if even a majority of the clerical trustees had consented, there would be no good objection to the alteration. Because, although the charter does not provide for it, yet, in the nature of things, it must be supposed that all human institutions may in the course of time require alteration."
Where the corporation consents to the amendment, the issue is no longer one based upon constitutional guarantees *291 involved in the contract or due process clauses. Nor are we concerned with the reserve power of the State to amend or alter corporate charters by virtue of constitutional or statutory provisions (N.J. Const., Art IV, § VII, par. 9, and prior constitutions and general act of 1846, page 16), since the original charter here antedates the creation of such reserve power in the State of New Jersey.
Although the amendments involved in the plan of reorganization concern themselves in the main with internal management, the nature of the amendments is such that they must be considered as fundamental and substantive. Board of Regents of the University of Maryland v. Trustees of the Endowment Fund of the University of Maryland, 206 Md. 559, 112 A.2d 678 (Ct. App. 1955), certiorari denied 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. ___; Ohio ex rel. White v. Neff, 52 Ohio St. 375, 40 N.E. 720, 28 L.R.A. 409 (Sup. Ct. 1895). The mere retention of control over the properties and assets by the Trustees as heretofore does not make the transfer of management any the less substantive in nature.
We cannot dispose of the issue by an over-simplified conclusion that the modifications are inconsequential or do not substantially affect the underlying trust and charter. The amendments must be analyzed to determine whether they constitute a substantial departure from the purposes of the charity and its charter. The proofs before the court through the exhibits and affidavits fully demonstrate that the reorganization plan is a fair and reasonable step in the development of the functions and purposes of the University. Present and future demands for expansion and financial aid, plus the past role of the University in its relations with the State, reveal that the contemplated step is a most reasonable advance in the successful development of the institution.
Authorities elsewhere have written on the need for necessary changes and modifications.
"It seems, indeed, desirable in the interest of charities in general, and of educational charities in particular, that it should be clearly laid down as a principle, that the power to create permanent institutions *292 is granted, and can be granted, only on the condition implied, if not declared, that they be subject to such modifications as every succeeding generation shall find requisite" 1 Report of Commission on Popular Education, 1861, p. 477 (England)
and in Central University of Kentucky v. Walters' Executors, 122 Ky. 65, 83, 90 S.W. 1066, 1070 (Ct. App. 1906), we note:
"The very nature of the enterprise, on the contrary, looked to improvement. It contemplated, by every reasonable implication, that new methods, new people, even new ideas, would be employed, when approved by the governing body of the institution. A college means, or ought to mean, growth; the elimination of the false; the fostering of the true. As it is expected to be perpetual in its service, it must conform to the changed condition of each new generation, possessing an elasticity of scope and work commensurate with the changing requirements of the times which it serves. For the past to bind it to unchangeableness would be to prevent growth, * * *."
It is clear that the purposes of the charter, namely, to establish a college "for the education of youth in the learned languages, liberal and useful arts, and sciences," is advanced and nurtured by the plan which seeks to effect greater financial support in order to bring the facilities of the University in line with the demands of modern society. The basic functions, purpose and role of the University as an educational institution remains unchanged. The mode or technique of internal management is changed. I find that the modifications are fair and reasonable and consistent with the purposes set forth in the charter and its subsequent amendments.
The more troublesome question is whether the consent of the Trustees is sufficient to validate the changes in the absence of the practical inability to secure the consent of the donors or beneficiaries. Some courts have taken the literal approach to the nature of the trust and have denied the right of the State and the trustees to produce changes without the consent of the founder. Cary Library v. Bliss, 151 Mass. 364, 25 N.E. 92, 7 L.R.A. 765 (Sup. Jud. Ct. 1890); State ex rel. Pittman v. Adams, 44 Mo. 570 (Sup. Ct. 1869).
*293 Other states have taken the view that the consent of the trustees is adequate if the amendments are not inconsistent with the basic purposes of the trustees, especially where the donors and beneficiaries are so numerous and unascertainable as to make it wholly impractical to seek their consent. Jackson v. Walsh, 75 Md. 304, 23 A. 778 (Ct. App. 1892).
In 55 Am. Jur., Universities and Colleges, sec. 7, page 6, we find:
"* * * the terms of the contract created by the original act incorporating a college or university may, as a general rule, be altered, modified, or amended by the assent of the corporation, even though the charter contains no such reservation and there was none existing in the general law of the state at the time the charter was granted."
and in 14 C.J.S., Colleges and Universities, § 2(b), p. 1329 we note:
"* * * As a general proposition the charter of an educational corporation may be changed by the legislature with the consent of the corporation"
The divergent decisions are reviewed and analyzed in an interesting article by Professor Austin W. Scott, entitled Education and the Dead Hand, 34 Harv. L. Rev. 1 (November, 1920). Professor Scott takes the position that progress demands changes and that as long as the changes are reasonable under the existing circumstances and consistent with the basic purposes of the charitable corporation, the concurrent action of the Legislature and the trustees is adequate to sustain the legal validity. As he points out, "The trustees are peculiarly fit to determine such questions. They hold and administer the properties; they and they alone represent both the donors and the beneficiaries." With this view, I agree.

III.
Defendants urge this court to decide in favor of the constitutionality of the reorganization plan set forth for "Rutgers, *294 The State University" in L. 1956, c. 61, in that it does not violate Article VIII, Section III, paragraph 3, of the State Constitution. That section of the Constitution, which is substantially identical to Article I, paragraph 20, of the Constitution of 1844, as amended in 1875, reads as follows:
"No donation of land or appropriation of money shall be made by the state or any county or municipal corporation to or for the use of any society, association or corporation whatever."
Chapter 61 of the Laws of 1956 gives no donation of land and makes no appropriation of money to Rutgers, The State University. The entire framework of the reorganized University is dependent, however, upon substantial appropriations each year from the State of New Jersey.
The three defendants have particular official interest in a determination concerning the validity of the new plan under Article VIII, Section III, paragraph 3. The Attorney-General, as part of the common-law duties of his office, participates in litigation to defend or attack the constitutionality of statutes. See Wilentz v. Hendrickson, 133 N.J. Eq. 447 (Ch. 1943), affirmed 135 N.J. Eq. 244 (E. & A. 1944). By R.R. 4:37-2 the Attorney-General must be furnished notice and allowed to intervene when the validity of a statute of the State is drawn in issue in any action, even if the State or one of its officers or agencies is not a party. The Treasurer is responsible for the disbursement of state appropriations and is head of the department with general authority over and responsibility for state finances and revenues. The State Board of Education is charged with the specific duty by statute (R.S. 18:2-4) of approving the annual budget for Rutgers University, in addition to its visitorial function (N.J.S.A. 18:22-15.9). The Attorney-General and the State Treasurer have the dual position of serving ex officio as members of the Board of Trustees of Rutgers University. The State Commissioner of Education serves in the same capacity, and upon the taking effect of L. 1956, c. 61, will be a member of the Board of Governors of the successor corporation, ex officio.
*295 The court gives great weight to the views of these public officials who in great measure have the dual roles of protecting the State and helping to provide for higher education for the people of New Jersey.
One of the conditions for withdrawal by the Board of Trustees of funds controlled by them is state failure at any time to provide sufficiently for the maintenance and conduct of a University with high educational standards to enable the plaintiffs to discharge their trust for public higher education (L. 1956, c. 61, section 20). An adjudication that the State could not, under Article VIII, Section III, paragraph 3, validly make appropriations to Rutgers, The State University, would cut off the reorganization plan and compel the Board of Trustees to apply to the court for a determination of the state "default" and for further instructions (L. 1956, c. 61, section 20).
Donations of land and appropriations of money by the State have been sustained in cases in which (1) the recipient is a public instrumentality, or (2) the recipient has furnished or agreed to furnish a substantial quid pro quo to the State.
Uniformly, the Legislature and Governor, since the enactment of chapter 49 of the Laws of 1945 have enacted and approved appropriation bills for the support of Rutgers University. For example, by L. 1955, c. 95, the State appropriated $10,356,303 for Rutgers' purposes. This practical construction by the Governors and Legislatures is entitled to great weight even as to constitutional provisions. Chief Justice Gummere for the court said:
"* * * whenever there is a debatable question as to the proper construction of a statutory provision, the contemporaneous and long continued exposition exhibited in the usage and practice under it requires the construction thus put upon it to be accepted by the courts as the true one. State v. Kelsey, 44 N.J.L. 1, [15 Vroom 1]; Fritz v. Kuhl, 51 N.J.L. 191, 200, [22 Vroom 191]; McNeal Pipe [& Foundry] Co. v. Lippincott, 57 N.J.L. 540, [28 Vroom 540]." Commonwealth Roofing Co. v. Riccio, 81 N.J. Eq. 486, 488 (E. & A. 1913)
*296 And the Court of Errors and Appeals, after quoting from Chief Justice Gummere's opinion, stated:
"And this applies generally to the construction of the Constitution." In re Hudson County, 106 N.J.L. 62, 75 (E. & A. 1928)
As stated above, chapter 61, Laws of 1956, for the first time provides for public control over the administration of Rutgers University. The name of the corporation "The Trustees of Rutgers College in New Jersey," is changed to "Rutgers, The State University," effective September 1, 1956. The corporation is to continue as an instrumentality of the State for the purpose of maintaining the State University, with its property and educational facilities impressed with a public trust for higher education for the people of the State. Similar provisions designating Rutgers as an instrumentality of the State for providing public higher education, and impressing the property of the Trustees of Rutgers College in New Jersey with a public trust for higher education, were set out in L. 1945, c. 49, but without placing control in a Board of Governors, a majority of whose members are public appointees.
State appropriations pursuant to L. 1956, c. 61, will be made not to the Board of Trustees, which continues in existence after September 1, 1956 with limited powers, but to "Rutgers, The State University," a state instrumentality for public higher education whose property and assets are impressed with a public trust for that purpose. The disbursement of state funds will henceforth be to a public instrumentality under the control of the State and for the fulfillment of the important objective of providing higher education for the people of the State.
I place no particular significance in the private appointment of five of the 11 voting members of the Board of Governors by the Board of Trustees. Such arrangements are by no means unique in our State Government. For example, by R.S. 4:1-5 the annual Farmers' Convention makes nominations to the State Board of Agriculture which apparently must be ratified by the Governor; similar provision *297 for the nomination of the Fish and Game Council is found in N.J.S.A. 13:1B-24. State appropriations for the support of the State Board of Agriculture, the Fish and Game Council, the Board of Managers of the New Jersey Firemen's Home, and the Consolidated Police and Firemen's Pension Fund Commission are made regularly and are viewed by the Governor and Legislature as valid within Article VIII, Section III, paragraph 3, of the State Constitution. State contribution to Rutgers, The State University, a public body over whose executive board a predominantly private body exerts minority appointive authority, is a direct parallel. 65 A.L.R. 1394. See Russell v. Trustees of Purdue University, 201 Ind. 367, 168 N.E. 529 (Sup. Ct. 1929), for a similar situation.
Rutgers University has been treated as a public instrumentality of the State of New Jersey on many occasions involving important legal implications. Opinions by Attorneys General Edward L. Katzenbach and David T. Wilentz concerning the public aspect of Rutgers University are part of this record. By the terms of chapter 49 of the Laws of 1945, Rutgers' employees were accorded eligibility for membership in the State Employees Retirement System. Chapter 84 of the Laws of 1954 continues that privilege within the new Public Employees' Retirement System. The Federal Department of Health, Education and Welfare determined in 1955 that employees of Rutgers University were eligible for old age and survivor's insurance coverage pursuant to the privileges of the Federal Social Security Act. That act provides for the extension of social security insurance coverage to "services performed by individuals as employees of * * * any political subdivision" of any State which enters into a basic agreement as to public employees' social security with the federal authorities. The definition of "political subdivision" within the federal statute includes "instrumentality" of the State. The opinion by Attorney-General Grover C. Richman, Jr., that Rutgers University was in this sense a state instrumentality is part of this record. All these authorities existed at the time chapter 61, Laws *298 of 1956, was enacted. The court is certain that the Governor and the Legislature knew of these opinions prior to enacting chapter 61.
I find that Rutgers, The State University, as it would be constituted after September 1, 1956, would be substantially an alter ego of the State, to which donations of land and appropriations of money might be made without offending the constitutional prohibition against gifts or appropriations to private corporations or associations.
The legal issue which might have been raised between 1945 and 1956 concerning the sufficiency of the contract consideration from the Board of Trustees to the State to support state appropriations within Article VIII, Section III, paragraph 3 of the Constitution of 1947, and the predecessor provision in the Constitution of 1844, is not before this court. However, the quid pro quo provided by Rutgers, The State University, to the State under chapter 61 of the Laws of 1956 would sustain the validity of state appropriations equally with the obligations now borne by the Board of Trustees under the 1945 statute.
Public appropriations which are founded upon some legal, equitable or moral consideration to the State are not prohibited by this constitutional provision. The accomplishment of an important public object or a moral duty to the citizens of the State is sufficient to sustain the validity of the appropriations. Morris & Essex Railroad Co. v. City of Newark, 76 N.J.L. 555, 560 (E. & A. 1908). It is not essential that the consideration meet the test of adequate consideration in the strict contract sense.
In Rutgers College v. Morgan, 70 N.J.L. 460 (Sup. Ct. 1904), affirmed 71 N.J.L. 663 (E. & A. 1905), the court sustained the power of the State to grant support to the Agricultural College on the ground that the Legislature had the constitutional power to furnish and support facilities for public education under its own supervision,
The court, at pages 473, 474, said:
"This provision, as well as that relating to special laws, does not bar instrumentalities for public education provided by the state and *299 under its control by general laws, where the appropriation is made for such schools. They were designed as an insurmountable barrier to giving free state aid, and to donations to private or sectarian schools, and should be rigidly enforced, but they were not intended to narrow or circumscribe the legislative power to furnish facilities by general laws for public education under its own supervision. * * * The Rutgers agricultural college was adopted as a state college, and such full control was maintained over it by the state as was deemed to be necessary to secure free public education in the department of agriculture and the mechanic arts."
A contrary result to the Morgan case was reached under the particular facts of In re Voorhees' Estate, 123 N.J. Eq. 142 (Prerog. 1938), affirmed 121 N.J.L. 594 (Sup. Ct. 1939), affirmed 124 N.J.L. 35 (E. & A. 1940). A transfer inheritance tax upon a legacy to The New Jersey College for Women, a subordinate branch of Rutgers University, was sustained upon a holding that a statute (L. 1925, c. 102) exempting from the transfer inheritance tax bequests to educational institutions which had received or might in the future receive state appropriations was unconstitutional. In reaching this decision, the vice ordinary pointed out that the State's right under the taxing statute vested at the instant of death in September 1924, preceding the enactment. I agree with counsel that an important factor was that the College for Women was conceded in that case to be a private institution despite the specific appropriations in large amounts during two prior years. Whatever the precedent weight of the Voorhees case is, it must be distinguished on its facts from our case which is akin to the Morgan case because of the positive state control. The extent of control in the legislation in the case at bar adequately falls within the definition contained in that opinion.
Other leading cases on this general constitutional issue include Lynch v. Borough of Edgewater, 8 N.J. 279 (1951), and City of Camden v. South Jersey Port Commission, 4 N.J. 356 (1950).
"Rutgers, The State University," as now constituted, is a public instrumentality for the accomplishment of a public purpose, i.e., public higher education in the State. *300 Nevertheless, a substantial quid pro quo for latter purpose would justify state appropriations within Article VIII, Section III, paragraph 3, even to a predominately private corporation or association. Thus, even were it held (and I do not so find) that "Rutgers, The State University" is a private institution, that institution, acting through its Board of Governors, would be under a substantial and definite obligation to the State for the fulfillment of a public purpose. That obligation is adequate consideration to sustain state donations or appropriations. Morris & Essex Railroad Co. v. City of Newark, supra (76 N.J.L., at page 560).

IV.
We consider other possible constitutional infringements of the State Constitution, such as the guarantee against the establishment or favoring of one religion (Art. I, pars. 3, 4); the restriction upon legislative power that private, special or local laws may not be enacted except upon public notice (Art. IV, Sec. VII, pars. 8, 9); the limitation on allowable state appropriations to one fiscal year (Art. VIII, Sec. II, par. 2).
The statute does not infringe the constitutional provisions restricting private, special or local laws. Rutgers College v. Morgan, 40 N.J.L. 460, 472 (Sup. Ct. 1904). The Legislature is dealing with an instrumentality for a specific purpose, i.e., public higher education in the State. Such legislation is parallel to legislation establishing agencies and commissions for the fulfillment of other public purposes. See Russell v. Trustees of Purdue University, supra, 201 Ind. 367, 168 N.E. 529, 65 A.L.R. 1384 (Sup. Ct. 1929), in which the highest court of Indiana rejected a similar argument on the ground that Purdue University was in a "class" by itself with which the Legislature had power to legislate directly.
Chapter 61 of the Laws of 1956 avoids any commitment on the part of the 1956 Legislature that state appropriations will be made to Rutgers, The State University, during *301 ensuing fiscal years. Future Legislatures are not bound, and therefore chapter 61 does not violate Art. VIII, Sec. II, par. 2, of the Constitution. Moreover, section 34 of the enactment expressly provides: "No provision in this Act contained shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit, of the State of New Jersey."
All presumptions favor the validity of legislative enactments. A statute should not be held unconstitutional unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. Behnke v. New Jersey Highway Authority, 13 N.J. 14, 25 (1953); Stothers v. Martini, 6 N.J. 560, 567 (1951).
I conclude that this court has jurisdiction to grant a final judgment and to give instructions and declaratory judgment with respect to the matters alleged in the amended and supplemental complaint; that fiscal support of Rutgers, The State University, pursuant to chapter 61 of the Laws of 1956 and under enactments of the New Jersey Legislature from time to time granting appropriations to Rutgers, The State University, will not constitute a violation of Article VIII, Section III, paragraph 3 of the Constitution of New Jersey as a donation of land or appropriation of money to or for the use of any society, association or corporation whatever; that chapter 61 of the Laws of 1956 does not constitute an appropriation of money in violation of Article VIII, Section II, paragraph 2 of the Constitution of New Jersey; that chapter 61 of the Laws of 1956 deals with a matter of substantial public concern and is not unconstitutional as an impairment of the obligation of a contract or deprivation of due process of law forbidden by the Constitution of the State of New Jersey or of the United States; that The Board of Trustees of Rutgers College in New Jersey individually, collectively and on behalf of the corporate plaintiff, has power and authority to adopt Chapter 61 of the Laws of 1956 as a valid and constitutional enactment, to amend the Charter of the corporate plaintiff in conformity therewith, and to effectuate the plan of reorganization which *302 is implemented thereby; and the same is a valid and proper exercise of their fiduciary duties which will not of itself subject it or them to liability or penalty for any violation or dereliction of its or their fiduciary duties; that the effectuation of the plan of reorganization of the Trustees of Rutgers College in New Jersey which is implemented by chapter 61 of the Laws of 1956, and the adoption of said act and amendment of said Charter thereby, will not of themselves as a matter of law adversely affect, forfeit or cause a reverter of the corporate plaintiff's interest in the properties and funds held or administered by it or which may in the future inure to its benefit, subject, however, in every case to special conditions subsequent or reversionary or other provisions affecting, and to the proper construction of, any particular gift, bequest, trust, transfer or other applicable instrument, including but not limited to the funds known as the "Beneficiary Funds" and so designated in the annual financial statements of the corporate plaintiff, and to the provisions of chapter 61 of the Laws of 1956 and other applicable laws, and without prejudice whatsoever to the rights and interests of any person or persons therein as may be determined in accordance with law.